Please be seated. The next case this morning is 24-2055 Sharpe-Miller v. Walmart. Counsel for appellant, if you would make your appearance and proceed, please. May it please the court. My name is Derek Garcia. I represent the plaintiff appellant in this case, Jerry Sharpe-Miller, who is also present today in the gallery. This is an employment discrimination case brought under Title VII of the Civil Rights Act of 1964, as well as the New Mexico Human Rights Act, both of which explicitly prohibit discrimination on the basis of sexual orientation. There are four compelling, highly compelling reasons why summary judgment in Walmart's favor was improper. First of all, Mr. Sharpe-Miller demonstrated numerous disputed material facts requiring findings by a jury. Without a fair apprehension of these facts, the district court's subsequent legal analysis became flawed. A fair and reasonable reading of the available evidence reveals that he was not terminated for attendance reasons. He was not demoted for performance-based reasons, but in fact was experiencing unlawful employment discrimination. Second, as the second most compelling reason, this court should reverse the granting of summary judgment in this case. Sharpe-Miller demonstrated a prima facie case for discrimination for sexual orientation and hostile work environment discrimination, including undocumented demotion, undocumented and baseless sexual harassment investigation that was occurring concurrently to his demotion, undocumented by Walmart and admitted erroneous termination. And Walmart had achieved actual notice of all of these numerous instances of adverse employment actions through its 14 managers over the course of the entire employment. You know, there's a reference to these 14 managers, but I was never able to identify who these 14 managers are and where in the record it shows that these 14 managers, these 14 unidentified managers, have notice. They were named throughout the brief by name. A lot of it comes directly, your honor, from Jerry Sharpe-Miller's own deposition-based testimony subject to cross-examination. I, you know, maybe I missed it, but I could identify a few, but I sure couldn't find 14. Managers Zamora and Morrow originally mentioned that plaintiff had a catwalk and that his hips weighed a lot, you know, as testified to by my client directly, Mr. Sharpe-Miller directly. And it was just one example of a management level perpetuation of discrimination-based, you know, employment discrimination by the managers themselves. Well, I mean, that was one. The catwalk was two. It was a manager and an assistant manager, right? Yes. Yes, your honor. Okay, he was afraid to break a nail, was a co-worker. Yes, correct. And there was no allegation that any manager was there or heard that? We believe that there were managers, as mentioned in the brief, that were present during other instances of overheard offensive statements. Okay, well, I'm taking one at a time. There weren't any that were there on the, are you afraid to break a fingernail? I don't believe so unless I'm mistaken, your honor. Okay, and then there was the comment of Jerry the fairy, and again, I didn't see anything to indicate there was a manager around when that was said. Jerry the was testified to by my client in deposition, and it came overheard through the break room. So, in other words, he said it was said in the break room, that they, as a matter of course, were using the f-word in the break room. Who, what managers does he claim heard those things? I believe it was a Ty Lozano in that case, in that specific instance, as if my memory serves. As this court knows, the plaintiff may demonstrate and satisfy the second prong of a McDonnell Douglas analysis through either indirect or direct evidence, and that this court established. There's two issues. One is whether you can show that there was, well, we have two claims, first of all, and you have to separate them out. One is that he has a claim that he was, suffered disparate treatment, and the other one is hostile work environment, and so they have different elements and you have to look at them separately, but if you want to get the defendant here, which is Walmart, you have a further requirement that you've got to show that they were aware of it and didn't act appropriately to stop it. Yes, and I believe there are numerous instances of other direct, more direct evidence where the management basically ignored the whiteboard scrawling of the capitalized letters of the words, the f-word, and that was directly complained to by Karina Lopez, who was a manager. She said that she would give the plaintiff a statement and she, you know, declined to do so, refused to do so afterwards. I think there are numerous examples. Karina Lopez. And again, I'm just trying to say where these 14 come from, because I think we've, at most right now, identified maybe five or six. I attempted to highlight each manager I mentioned throughout the opening brief just to really highlight each manager that was specifically involved in the demotion decision and as well as the termination decision. Manager Charles Stark, who testified that he didn't even remember personally firing the plaintiff, so certainly circumstances giving rise to reasonable inference of discriminatory intent, is another example of a manager that contributes to the 14 managers that were involved in numerous instances of discriminatory treatment and disparate treatment. And can I hit the pause button for a second? I mean, does this have to be actual knowledge? I mean, I thought our case law, Ford being one example, Ford versus West, says it can be constructive knowledge. So what, so, I mean, is, I mean, I think that is clear to me that that, it really matters. I think that's correct to work environment. Yes, I think that's correct. Actual knowledge is not necessarily needed to be demonstrated. I think we're, we might be, you know, held to a higher standard here. We're talking about the standard is on the prima facie case, circumstances giving rise to a reasonable inference of discriminatory intent. And then on the third step of McDonnell Douglas is we're required to show that the excuses for the demotion, the excuses for the termination, were pretextual. Yes, but the point is that for employee, to hold the employer liable, there has to be knowledge. The question becomes, what kind of knowledge are you talking about? And I guess what I'm saying is my understanding that it could be actual or constructive. I take it you agree with that? Yes, sir. And, and let me, let me ask you about the hostile work environment claim. What theory of hostile work environment are you pursuing? Are you saying that this, this atmosphere, this polluted discriminatory conduct was severe? Or are you saying that it was pervasive? Or are you saying it was both? Both, your honor. I assumed as much. Well, if you're saying that, which one is stronger here? I would say, I would say, severe in that even overheard uncorrected uses of the F word in, in a, in a workplace environment are completely improper. And certainly ignoring any kind of substantive investigation concerning the capital use, capital letters of the F word use on the, in the backroom board. The most, one of the most compelling parts of this case is that Walmart refused, failed to refuse to basically document anything. There was nothing in Jerry Chartmiller's personnel files that show he had any performance-based issues or habitual tardiness, as the district court erroneously found. So I think that for those reasons, a reversal of summary judgment is proper. Did Mr. Chartmiller ever complain about these offensive comments? Yes, he complained directly to manager Karina Lopez about the anonymous scrawling of the, the words, the F word in the, in the backroom. And then Walmart failed to refuse to obtain any sort of witness statements or attempt to identify who was responsible for this. So you're saying he complained about the drawing on the, the board in the break room? Yes, Your Honor. Is that the only complaint? No, he also made some, originally some written complaints about disparate treatment in work assignments. But that had nothing to do with his sexual preference. That was, that, in fact, it was, one of them was a complaint that his crew was being worked too hard. And another one was about certain, one employee was getting favored treatment over other employees. Yes, I believe that, that maybe it wasn't as closely related to unlawful sexual orientation discrimination. But are you accepting the premise that it cannot be considered because it was not closely related? No, I believe it should be considered in a continuing violation doctrine. As the Charles case, New Mexico Supreme Court makes clear, totality of the circumstances needs to be considered going all the way back to the original employment in 2017. And Aaron Jones's, manager Aaron Jones's original offensive statements comparing LGBTQ status to pedophilia and bestiality going all the way back. Let me, let me ask you a great, I know you're out of time, but I'll allow for that. Let me ask you sort of a granular question. On page 10 of your opening brief, there's a reference to Sharpe Miller testified to his prior written complaint being ignored by historic court co-managers of the time, of the time, Yvonne Lujan and Louisa Lozano. And you cite to a page 97 of the record. I, I, what written complaint are you talking about? I couldn't find that reference. It comes from Sharpe Miller's oral oral deposition testimony that he made that written complaint. We asked for discovery and it was never provided to us. And so we believe that under the summary judgment standard, his testimony on that specific issue should be believed and construed in his favor. What was the subject matter of that written complaint? If I'm not mistaken, I believe it was for disparate treatment and work assignments and the scheduling disparities. Okay. And with that, I have no further time reserved for rebuttal. Thank you. Thank you, counsel. Good morning, your honors. Chelsea Sharon for the EEOC as a guest. We're here today to ask this court to correct several legal errors in the district court's analysis of the disparate treatment and the hostile work environment claims. I'd like to begin, if I could, with the district court committed. The first is that the district court said that plaintiff's demotion, which is undisputed, resulted in a loss of pay, did not qualify as an adverse employment action. Whereas under both the Muldrow and pre-Muldrow standards, a demotion resulting in a loss of pay is actionable because it causes harm to a term or condition of employment, namely compensation. Second, with respect to the inference of discrimination prong of plaintiff's prima case, the district court treated as dispositive Walmart's proffered non-discriminatory reasons, whereas this court's case law makes clear that a plaintiff does not have to dispel the employer's purported non-discriminatory reasons at the prima facie stage. By treating those Walmart's reasons as dispositive, the court short-circuited the analysis at the prima facie stage. It collapsed. Exactly, exactly, your honor. With respect to the third error, the district court treated Walmart as having satisfied the second-step burden here, even though Walmart produced no admissible evidence of the reasons for plaintiff's demotion or termination. Walmart did not offer any personnel records. It did not offer any testimony from decision-makers. Instead, it relied on double, as to the demotion, it relied on double hearsay testimony from plaintiff's deposition that amounted, even if admissible, to nothing more than vague allusions to something that the market manager didn't really like. And as to the termination, Walmart again relied on hearsay testimony from Supervisor Melendez that another supervisor, Stark, told her that plaintiffs should be removed due to attendance violations. However, Melendez subsequently contradicted that testimony by stating that she could not recall that conversation, by stating that Stark had directed her to remove Sharp-Miller from the payroll, and Stark himself testified that he could not recall the reasons for Sharp-Miller's termination, or even if he had any involvement at all. I'd like to turn, if I could, to the hostile work environment claim and point to five discrete legal errors the district court committed with respect to that claim. First, your honors, the district court suggested the conduct that the district court did not deem related to plaintiff's sexual orientation should be disregarded. Legally, that's incorrect under this court's case law because facially neutral conduct cannot simply be disregarded under a totality of the circumstances analysis. In addition, as a factual matter, a reasonable jury here could easily find that certain incidents the district court suggested were not related to sexual orientation were in fact facially discriminatory. For example, the fact that plaintiff was called Jerry the Fairy, for example, the break a nail and catwalk comment, and of course the drawing of an individual with the f-word across their forehead. Second, your honors, the district court suggested that conduct that was not directed at the plaintiff or that was not attributable to a specific declarant should be discounted in the hostile work environment analysis. But we know from this court's case law that that conduct, especially derogatory comments, can be offensive to a plaintiff even if not directed specifically at that plaintiff and should not be disregarded as part of the analysis. The employer has to know about this conduct and so speak to the issue of knowledge and where we can glean that the employer would have known about this discriminatory conduct. I apologize, your honor, we did not take a position with respect to employer liability here. Our focus was on the specific legal errors that we believe the district court committed, so I apologize that I'm not authorized to take a position on that. Well, are you authorized to take a position on whether what theory of hostile work environment is most appropriate here? I'm not, your honor. I did not take a position again on the factual application of the severity or pervasiveness standard to the conduct here, but again just on the district court's legal errors with our limited space. Can you take a position on whether or not the requirement of notice must be pled or argued under Burlington and other cases? Are you speaking specifically with respect to employer liability, your honor? Yes. I cannot take a position on that, I apologize. Continue with your litany of errors. Please feel free to interrupt. You're going for a third one. Yes, I am. I see I only have seven seconds. Do you want me to continue? Knock it out. Okay, thank you. With respect to the third legal error, your honors, the district court suggested that interference with work performance was required to show a hostile work environment claim. We acknowledge, of course, that under Harris that is one of the relevant factors to be considered. However, the district court appeared to distill from Harris's five-factor test that that was the overall inquiry that the court should look to and also seemed to confine that inquiry too rigidly to whether the plaintiff quit or wanted to quit his employment. The district court emphasized at page 26 that Schertmiller did not quit despite the offensive comments, but of course interference looks more generally to whether it was more difficult for the plaintiff to do his or her job. If you want me to continue, please tell me if you want me to stop. The fourth error, your honors, is with regard to the district court's suggestion that a steady barrage of offensive comments was required for a hostile work environment claim. We recognize, of course, that this court's case law has used that term, but it has in subsequent decisions clarified that that's meant simply to mean that isolated incidents do not amount to pervasive conduct, but there's no indication here that the district court believed the incidents to be isolated. In fact, in that same paragraph in discussing a steady barrage, the district court noted that plaintiff had said that over a two-year period he overheard the f-word and the term butt pirate, and the district court did not seem to suggest that he believed the conduct to be sufficient. It's hard to discern exactly what he meant, but he seemed to think that it was, I'm sorry, the district court seemed to think it was insufficient, numerically insufficient, to amount to steady barrage. If the conduct is particularly severe, then you need less of it, right? And that's correct, your honor. Of course, the conduct does not have to be, it's a disjunctive standard. It needs to be either severe or pervasive. So even if it were not pervasive, that would not necessarily be fatal, of course, to the claim. And the final point we wanted to make was with respect to the categorical rule the district court advanced that discrete discriminatory acts like demotion or termination can never form part of a hostile work environment claim. That is contrary to the Supreme Court's decision in green, which suggests that discrete acts can form part of a hostile work environment claim, as well as the overwhelming majority of circuits and all circuits post-green that have considered the issue have reached a contrary conclusion. Those are the areas we wanted to bring to your court's attention. I'm happy to answer any other questions, but I do appreciate the extra time. All right. Thank you. Thank you very much. Would you give Walmart 20 minutes, please? And we'll be liberal if you end up needing more. Good morning, your honors. May it please the court. Larry Montano on behalf of Walmart. Summary judgment should be affirmed in this case. As this court understands well, cases that present tribal issues of fact should survive summary judgment and should be allowed to go to trial. In this case, the district court judge undertook great effort in an attempt to what the plaintiff's allegations are, what evidence had been presented to sustain those claims. And after reviewing all of that evidence, the district court judge rightly determined that summary judgment should be granted to Walmart. Turning to the hostile work environment claim, the district court judge decided that it couldn't consider comments that weren't directed specifically at Mr. Sharp Miller. That's incorrect, isn't it? If that's what the district court judge had done, that would be incorrect, your honor. That's not what I believe occurred here. Relative to the EEOC's arguments, what the district court judge did, both in the initial decision and then also relative to the plaintiff's motion for reconsideration, is the judge articulated the legal standards and then in an attempt to approach those issues in a logical fashion, proceeded to address each one of them. And so with respect to the different elements, the different factors that weigh into an analysis of hostile work environment under Title VII and those related issues, that is what the district court judge did. Well, the district court's opinion doesn't even discuss the drawing in the break room of the picture with the F word right there for everyone to see. That seems like a substantial omission in analysis. Your honor, I agree that the district court judge did not discuss that one particular act. Earlier today, we heard counsel say that it was Mr. Sharp Miller who complained about that. If you read the testimony, he did not complain about that. What happened is that a supervisor went into the room, observed that there was that inappropriate. And she erased it and said, boys will be boys and did nothing else. Agreed, your honor. I think if we refer to that one discrete act, obviously that is one discrete act. And if that had had an impact on Mr. Sharp Miller, then certainly as this court has already observed, it doesn't have to be a of incidences. It doesn't have to be a litany of inappropriate remarks. And Walmart understands that. But this was a discrete remark. It was not directed at the plaintiff. There was no suggestion by the plaintiff that in his testimony. You just said it didn't have to be directed at the plaintiff. So what if it wasn't directed at the plaintiff? I mean, it was there for the plaintiff to see and it suggested something about the environment. I mean, although it's not a match, but I think of our case, Tatamy, which involved the noose hanging up there. And we found that that was a very significant act, had significant impact for the plaintiff. And the plaintiff knew that this was a sign of, and actually quit right after that happened. So why can't we infer from how Walmart responded, one, they knew what it meant. Number two, that they blew it off. That that's a significant variable going towards the nature of the environment. I mean, it's severe or pervasive. Well, that's pretty darn severe, isn't it? That is a severe comment, Your Honor. But again, I think what the district court judge did here relative to whether specific comments or that particular drawing was directed at plaintiff was not to suggest that if it wasn't, that therefore it's irrelevant. It was more in the if someone makes a direct comment to you and says something directly to you. You know, if I went into the roving room and somebody had drawn a picture of a woman and put the C word across the top, it wouldn't have to be specifically directed to me for me to be pretty upset about it. I understand what Your Honor is saying. And I'm not here to tell you that Mr. Scharkmiller should not have taken offense to that. Well, and it's not one instance of, you know, if we're looking at either pervasive or severe, I think reasonable people could say use of the F word is severe. And it's not even a single incident that the record suggests that it was thrown, that word was thrown around routinely in the break room. If I might address that, Your Honor, and you touched upon this in counsel's opening remarks, there are allusions in their briefs to these different comments. But if you look at the record, they're not substantiated in many instances. That's one of the dilemmas that we are dealing with here, both in their briefs and also in their pleadings where assertions were made. But then you look at the and where is the evidence to support that? Well, didn't Scharkmiller testify to that? He testified to that one specific incident, Your Honor. But again, I thought he also said that it was used routinely in the break room. He did. He did say that. Why isn't his testimony evidence? It is evidence, Your Honor. But ultimately, it has to be imputable to Walmart. And I would like to commend to the Court Mr. Scharkmiller's deposition testimony, which we supplemented the record so that this Court would have all of his testimony. At page 181 of his deposition, he was asked the following question. Now, you would agree with me that if there was any corrective action that could have been taken or should have been taken with regard to the incidents that you never gave Walmart an opportunity to do that, correct? Council objected to form. Council followed up and said, correct, Mr. Miller. No objection. Answer, yes. Next question. And you would agree with me that as part of your knowledge of the policies at Walmart, you would agree with me that you had, that Walmart provided you with opportunities to report the answer, yes. Your Honors, that's the issue that we have here, is over the course of four years of employment at Walmart, there is no suggestion by Walmart that there were never inappropriate comments made or that that drawing on the chalkboard was not there. What about the evidence that was pointed out by opposing counsel of knowledge by supervisors and management people? Your Honor, Judge McHugh rightly noted that there are two instances in the record in which there were managers that were present. The first one that occurred during Mr. Schartmiller's employment, which as I understand, was within a matter of a couple months of the time that he first became employed by Walmart. That was one of those comments. And Mr. Schartmiller's subsequent testimony is that he never had another negative experience with that person, and that person did not have supervisory control over Mr. Schartmiller. That's one of those incidences. The other incidents that Judge McHugh... Are you talking about the catwalk and that kind of thing? No, Your Honor. What are you talking about? That is the one where the person talked about pedophilia. Okay. Well, I mean, all right, so we got the bestiality pedophilia. We have the later, we have supervisors, two supervisors, talking about his catwalk and squishing of the hips, right? Yes. Okay. Well, I mean, how much do you need? I mean, you've got it on the wall, which was blown off, apparently, by Walmart. You have the pervasive, according to the testimony of Mr. Schartmiller, in the break room, the use of the F word, if one wants to put it that way. And then you have these other instances. I mean, how much do you need before? I mean, the standard is severe or pervasive before the environment is as such that an employer who is sensitive to discriminatory conduct would know that something was going on. And even if they didn't know it, they should be put on constructive knowledge that something is going on. The issue with that, Your Honor, is there cannot be constructive knowledge imputed to Walmart. Judge McHugh... Our Ford case specifically says that you can use constructive knowledge. I'm speaking factually here, Your Honor. Because these comments that Mr. Schartmiller talked about, he was asked in his deposition, well, who else was present during this? And he couldn't say. Well, he testifies that Myra Hernandez was in the back room when these homophobic slurs were being used. She's a supervisor. He testified that Karina Lopez saw the drawing on the board and said, boys will be boys. And that the people who made the comments about the catwalk were two supervisors. And then there's also Jones, a senior member of management, that was there when, who actually said the homosexuality, bestiality, and pedophilia comments. I mean, that sounds like a, it's not 14, but that's what I've been able to call from the record. Your Honor, first of all, with respect to the catwalk issue, Mr. Schartmiller testified that they were joking. And he said that he took offense to that. When he was asked, did you say anything about it? He said, no, I didn't. I think about a case where Judge McHugh and I were on Lowndes versus LendCare. And a lot of these same issues came up. And it was very clear that the fact that they were joking was irrelevant. The point was, did they pollute the environment with stuff that would be objectively offensive? Somebody saying, oh, well, I was joking when I called somebody the N-word, or I was joking when I called somebody the F-word is irrelevant. It doesn't matter. The point is, you put it in the environment, and it was objectively offensive. And whether it was directed at the plaintiff or not, was it objectively offensive? That case maps right onto this case. Unless you tell me differently, I don't understand why the results shouldn't be the same. I do think that this is different because, as Mr. Schartmiller himself testified, this was in the context of a discussion where they were joking. Again, Your Honor, I hear what you're saying, and I do not disagree with the notion that there are certain statements, certain terms that can be used that are so overtly offensive. In Mr. Schartmiller's case, he says, yes, I do walk with a sway. And I do do a catwalk from time to time. But again, that was not, at least from the perspective of the declarant, there was no attempt made to say something offensive. The fact that it might have been taken that way is a different matter. I'm sorry if I did not communicate this point correctly, which is simply that whatever the employer, whatever the declarant said, whatever their intent was, is irrelevant. I mean, we made that clear as a matter of law, it doesn't matter. If I call you the N-word and I'm the best, you're my buddy, it really doesn't matter. If I pollute the environment with things that are objectively offensive to other people in that environment on a discriminatory basis, that's it. What difference does it make whether I had a pure heart or not? It doesn't matter. Your Honor, I think it matters only in the sense that this was a conversation between them and Mr. Scharkmiller. There weren't other, at least as I can tell from the record, no other people were present. The way that the testimony came across is that this was a joking discussion amongst friends. You keep going back to the joking. And one minute you say you understand and it doesn't matter, it's joking, and then you go back and keep repeating that it's joking so it doesn't count. Where are you coming from on this? It counts, Your Honor, in terms of the law, but it doesn't count in terms of the overall environment that Mr. Scharkmiller was in. Let me ask you this. Apparently there are not 14 instances of supervisors in management. Would you agree that there are more than two? I would not agree that there were more than two. How is that possible since two of the people who were making comments were supervisors? Those are the two that I'm aware of. Well, that two, the person who wiped off the F word on the board, was that one of the two? I don't think so. I think that that would be a third one. And that's the third one that I can think of, Your Honor. And what about Senior Management Jones, who is the one who compared homosexuality to bestiality and pedophilia? That's the first one. That's the first one. Oh, well, what about then the two, the supervisor and assistant supervisor that made fun of his catwalk? That is the second one. Those two people are one? The testimony wasn't clear to me, Your Honor, if those were set in two different settings, but that would be the second one. Well, that's a reference to an episode. That's not a reference to a person. I mean, if there was one episode and there were two people involved and they were both management people, they're individuals. And I mean, those individuals are on notice for Walmart that there's conduct going on because they're the perpetrators of the conduct, right? Correct. Correct. I agree with that, Your Honor. All right. Before you sit down, I'm going to ask the question about the ability to carry out the second step of McDonnell Douglas as it relates to the demotion and the termination. I think I've been on this court more than 18 years and I don't recall seeing a situation in which the employer relied upon some garbled statement of the plaintiff as their legitimate explanation for why he was fired. How does that make any sense at all? The statement of Mr. Sharp Miller was equivocal as to the demotion, as to why he was demoted. I don't think he even knew why he was demoted. How can that be your legitimate explanation for why he was demoted? Your Honor, in the first instance, as we have pointed out in our papers, that complaint is untimely. Let's assume for the moment it is timely. I'm asking you on the merits so I understand what your position is. Yes. And the other thing I would say, and it's clear that Your Honor has read much of his deposition testimony. I myself have read his deposition testimony. It's not unclear. He testified in his deposition for pages upon pages about being brought back into a room where he was told that his work was deficient and he was specifically told that a market manager who had visited the location, that he had observed that Mr. Sharp Miller had not complied with company policy with respect to spilled liquids. Mr. Sharp Miller acknowledged that he did not. I read that statement and regrettably, it was not expressed as eloquently as you're doing now. I mean, and concisely. I mean, there was a lot of hemming and hawing about what Mr. Sharp Miller knew or what he didn't know, but more to the point, is there an affidavit or anywhere from a Walmart employee saying we demoted him for X reason? There isn't, Your Honor. And why isn't that important? I mean, who cares what Mr. Sharp Miller thought? I mean, Walmart is the one who's got the burden to explain why they did what they did, right? Your Honor, when you look at the summary judgment evidence, certainly a statement by the plaintiff, a statement by a party opponent, is an admission. Walmart was entitled to rely on his testimony. Well, his testimony is, I'm not really sure it might have been this. I mean, that's the best I got out of his testimony. Your Honor, as I was rereading his deposition testimony, it's a bit sinuous. Well, I'm happy— 386, 387 is what I have. Yeah, and I'm happy to go through the pages because it takes—it went over the course of several pages. And I agree with Your Honor that there were times when he said, yes, and then there were times when he says, I'm not sure. Well, you're asking him to speculate what was in Walmart's—I mean, nobody ever said to him, this is why you're being terminated. He never got any—there's no paperwork that says this is why we terminated him. If I might address the termination issue, because, again— I'm sorry, I'm talking about demotion. Okay. Well, relative to the demotion, Mr. Sharp-Miller articulated that one thing. And as far as if Walmart—if he had speculated and he had said, it could have been this, it could have been that, it could have been three things or four things or five things, and Walmart said, it was all of those things, then I think we would be having a very different discussion here. But we don't have that piece of Walmart saying, this is what it is. But we do, Your Honor. We have Sharp-Miller saying, you know, I'm not really sure. This might have been what it was. But you don't have testimony or record evidence, documents that are—can be evidence of Walmart's position for why they demoted him. Walmart's position is set forth in its motion for summary judgment. When Mr. Sharp-Miller testified to this, it agreed to that. That was the only testimony that it relied on for purposes of his demotion. And that is evidence. Ultimately—and I can see that my time is finished here—but at the end of the day, I go back to what I read into the record just a moment ago relative to Mr. Sharp-Miller's own testimony, where he said he was a supervisor at one point. He was educated on what he could do if he was subjected or if he was aware of any appropriate comments, anything that would create a hostile work environment. He was told how he could seek relief. And he knew that— So is it your position that if he doesn't make a complaint, but Walmart is, let's just say, and not even just constructively, but actually aware of repeated use of the F-word and harassing comments to him, because he didn't make a complaint, they have no obligation to make efforts to stop it? No, Your Honor. That is not Walmart's position. Walmart's position is, over the course of four years, what plaintiff has been able to identify are a discrete number of comments. There have been allusions to 14 managers and to lots of comments and backrooms and all of those things. But in terms of admissible evidence, what is it that could actually be presented to a jury? That is what the district court judge relied on. And I will just end with this, that relative to really this entire case, as I understand it, plaintiff's complaint is that he was constructively discharged. And for purposes of that claim, he relies on comments dating back to 2017. And what the district court judge concluded is that you weren't terminated. There was a mistake that was made. It was acknowledged. An apology was made to Mr. Sharpe Miller, and Mr. Sharpe Miller was reinstated that very day. And so this suggestion that there might be confusion about why he was temporarily terminated, with respect, just by virtue of the temporal proximity to him having missed a day and him having been temporarily terminated and then to be reinstated that very same day, I think it speaks to the fact as to why he was mistakenly terminated, why he was reinstated, and why all of these things do not give rise to constructive discharge, because he was not discharged and he was not put in a position where his conditions of employment were so intolerable. And to that end, I would say it is my understanding that Mr. Sharpe Miller continues to be employed by Walmart, and that has not been something that has been brought to the attention of this court. We understand that. Thank you, Your Honor. Let me ask you this. Did you plead and submit a Farragher Burlington claim that, or defense, that the plaintiff had to report the hostile work environment, the hostile work environment matter? I don't think that it was put that specifically, but it was argued in the papers. It's clearly in the papers that he had, that the plaintiff had to complain to Walmart. Yes, Your Honor. What was presented in the papers, and Mr. Sharpe Miller testified about this throughout his deposition, where he was both as part of the orientation process, and then when he was made a supervisor for a period of time, that he was advised about all of these policies. I understand that. That's not my, my question is, are you saying that regardless of what his education was on that, that, that his failure to report is the death knell for his claim on hostile work environment? Yeah, I wouldn't go that far, Your Honor, because. Oh, well, how, then how far do you go? Is his complaint irrelevant? I don't think it is irrelevant, Your Honor. I think to, to the Chief Judge's point. This sounds like it's a kind of a defense, but not really. It's, it is a defense in the following sense, Your Honor. If Walmart itself, if, if people in a managerial capacity were not made aware of these comments, other than the three and possibly four that we've talked about. You're dancing around this. There are two issues on this notice, and that is management observing this, and whether there was an obligation for the plaintiff to report to management. I'm talking about the latter. Are you taking that position that his failure to report is the death knell to his claim? No, no, we are not. Thank you. All right. Thank you, counsel. Thank you. Thank you, Your Honor. I thank you both. We'll understand you've been heard. Case is submitted.